## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-17-290-D |
| | ) | |
| DANIEL WEBSTER KEOGH, a/k/a | ) | |
| Web Keogh, and DANIELLE KEOGH, | ) | |
| a/k/a Danielle E. Truitt, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

The following motions under Fed. R. Crim. P. 12(b) are fully briefed and presented for decision:  Defendant Daniel Webster Keogh's Omnibus Motion to Dismiss the Indictment [Doc. No. 97] and Motion to Dismiss the Superseding Indictment [Doc. No. 233]; and Defendant Danielle Keogh's Motion to Dismiss Count 12 and Counts 14 Through 16 Based on Insufficiency of the Indictment and Duplicity [Doc. No. 102], Motion to Join Daniel Webster Keogh's Omnibus Motion [Doc. No. 100],  and Motion to Dismiss the Superseding Indictment and Join Daniel Webster Keogh's Motion [Doc. No. 235].  Defendants are husband and wife and will be referred to individually as Mr. Keogh and Mrs. Keogh.  Their Motions raise overlapping challenges to the sufficiency of the government's pleadings and, thus, will be addressed in a single order.  The Motions are combined with supporting briefs and are further supported by reply briefs and a supplemental brief [Doc. Nos. 116, 123 and 214]; they are opposed by the government's response briefs [Doc. Nos. 111, 112, 219, 234 and 236].

## Factual Background

Defendants stand charged in the Indictment [Doc. No. 1] and now the Superseding Indictment [Doc. No. 228] with engaging in two separate criminal conspiracies in violation of 18 U.S.C. § 1349: Count 1, a conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344; and Count 12, a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343.

Related to the alleged bank fraud conspiracy, Defendants face multiple charges in Counts 2-4 and 6-11 of making false statements and willfully overvaluing property to influence loan decisions by a financial institution, First Pryority Bank, and a guarantor, the Rural Development Administration, in violation of 18 U.S.C. § 1014.[1] The object of the conspiracy and the focus of the statements was a $3.2 million loan to Triton Scientific, LLC ("Triton"), a limited liability company controlled by Mr. Keogh as president and chief executive officer and Mrs. Keogh as director of finance.[2] Count 5 charges Mr. Keogh with making a false statement in a matter within the jurisdiction of the United States Department of Agriculture ("USDA") by misrepresenting the purpose of the loan, in violation of 18 U.S.C. § 1001(a)(2).

Related to the alleged wire fraud conspiracy, Defendants are charged with multiple offenses of wire fraud (Mr. Keogh, Counts 13-19 and Mrs. Keogh, Counts 14-15 of the

---

[1] Specifically, Counts 2 through 4 allege that Mr. Keogh made false statements to obtain approval of a loan. Counts 6 through 10 allege that Defendants made false statements to obtain loan advances and to maintain a lending relationship. Count 11 alleges Mrs. Keogh made a false statement to influence the bank to renew a revolving line of credit.

[2] Triton was owned by The Keogh Group, LLC, a limited liability company also controlled by Mr. Keogh as president and CEO with Mrs. Keogh as chief financial officer.

Superseding Indictment) in violation of 18 U.S.C. § 1343.  Generally, the alleged fraud involved Defendants' diversion of federal payments under contracts between Oklahoma State University–University Multispectral Laboratories, LLC ("OSU-UML") and the United States Department of Defense ("DoD") to Defendants' personal businesses and other uses.  Defendants were able to accomplish the alleged fraud, in part, because Triton operated and managed OSU-UML.  A subcontractor on the DoD contracts was Commuter Air Technology, Inc. ("CAT"), which provided support services to the United States military that included surveillance and reconnaissance work with special-mission aircraft. Additional facts regarding the alleged offenses will be provided in the discussion *infra*.

Finally, Mr. Keogh is charged in Counts 20-22 of the Superseding Indictment with theft from an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A). Specifically, Mr. Keogh allegedly took money from OSU-UML on three occasions in September 2012 while serving as its laboratory director.

## Defendants' Motions

Mr. Keogh asserts that the government's loan fraud case is legally flawed because the Superseding Indictment "does not allege falsity or knowledge of falsity."  *See* Omnibus Mot. at 18.  He argues that the charges in Counts 1 through 10 are based on false representations that Triton's loan would be used to buy "equipment" and that overstated its "value" but these terms lack singular meanings.  Specifically, Mr. Keogh contends the government does not allege he knew the term "equipment" necessarily meant existing equipment – as opposed to equipment being developed and manufactured – or that the "value" of the equipment should be determined using a market value rather than a cost

method.  Mr. Keogh also contends the USDA false statement charge in Count 5 refers to a concealment of facts as well as a false statement and thus lacks specificity.

Mr. Keogh asserts that the government's wire fraud and conversion case is legally flawed because it is based on a contractual dispute and mere delay in OSU-UML's payments to a subcontractor (CAT) rather than a fraudulent use or theft of government funds.  Mr. Keogh also asserts that OSU-UML was a commercial government contractor and not an organization covered by the theft statute, which requires a receipt of benefits "under a Federal program involving a . . . form of Federal assistance."  *See* 18 U.S.C. § 666(b).  Finally, Mr. Keogh asserts that the government's allegations show OSU-UML was not the victim but, instead, the injured party was the unpaid subcontractor, CAT.

Mrs. Keogh similarly asserts the wire fraud charges lack factual allegations that establish a scheme to defraud but show, "at most, a potential breach of contract and/or breach of fiduciary duty claim arising out of Triton's alleged failure to fulfill its management duties to OSU-UML."  *See* Mrs. Keogh's Mot. Dismiss [Doc. No. 102] at 10. Mrs. Keogh challenges the substantive wire fraud charges against her because they are based on wire transfers from Triton to Erys, a limited liability company that she owned and used both to provide administrative and accounting services and to fund a women's clothing boutique, Liberté.  Mrs. Keogh contends the wire transfers could not have been part of, or made in furtherance of, a fraudulent scheme because the alleged scheme was complete when the funds were transferred from OSU-UML to Triton.  Finally, Mrs. Keogh asserts that the wire fraud conspiracy in Count 12 is duplicitous because it encompasses

two separate conspiracies that lacked a unified objective, one alleged conspiracy between Defendants and a second conspiracy between Mr. Keogh and others, discussed *infra*.

## Standard of Decision

Rule 12(b)(1) authorizes a pretrial determination of any defense or objection "that the court can determine without a trial on the merits."  A pretrial motion may properly be decided under this rule if it does not require the resolution of "any disputed questions of fact about the circumstances of the alleged crime."  *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010).  A trial court may decide pretrial motions "that require it to answer only pure questions of law," and "a court may always ask whether the allegations of the indictment, if true, are sufficient to establish . . . the charged offence."  *Id*. (quoting *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006)); *see* Fed. R. Crim. P. 12(b)(3)(B)(v).

## Discussion

### A.    Loan Fraud

To provide context for Mr. Keogh's arguments regarding the bank fraud conspiracy and false statement offenses, a summary is needed of the factual allegations of the Superseding Indictment regarding Triton's bank loan.[3]  The pertinent facts begin before Triton applied for the loan.

---

[3]  Consistent with the standard of decision, the government's factual allegations are accepted as true for purposes of this Order.

In 2009, Mr. Keogh formed EMB Energy, LLC to research energy storage capabilities with a goal of developing a commercial storage device.[4]  In late 2009 or early 2010, Mr. Keogh communicated with Lawrence Livermore National Laboratory (a federally funded research facility in California) about a collaborative effort to research and develop electromechanical battery technology.  Their discussions culminated in a research and development agreement that Mr. Keogh signed on behalf of EMB Energy on September 26, 2010, regarding an electromechanical battery project that involved building and testing prototypes.  The agreement required EMB Energy to provide funding and in-kind contributions, and if the project was successful, EMB Energy would own prototype batteries that it could develop for commercial use.

Prior to the written agreement, Defendants contacted First Pryority Bank (hereafter, the "Bank") in July 2010 about a proposed loan to Triton for $4 million to purchase capital equipment described as a battery or set of batteries.  Mr. Keogh specifically stated that Triton needed to "purchase and install a significant piece of capital equipment for electrical storage."  *See* Superseding Indictment ¶ 19(B).  Defendants did not mention using the loan proceeds to fund EMB Energy's battery project but, instead, represented that Triton was purchasing machinery and equipment (a battery or set of batteries) to be installed at an OSU-UML facility.  On September 26, 2010, Mr. Keogh signed and provided to the Bank and USDA's Rural Development Administration an application for a guarantee of the requested loan; the application stated the project would be located in Chilocco, Oklahoma,

---

[4]  Despite its LLC name, EMB Energy was a C-corporation of which Mr. Keogh was the chairman and CEO and Mrs. Keogh was the senior vice president of finance.

and the loan was for "equipment purchase only." *Id.* ¶ 20(D). Defendants provided additional documents to support an equipment loan, including an addendum stating that Triton wanted to "procur[e] a battery or set of batteries between 250kWh to 2 MWh to install at the outdoor test and training facilities in Lawton and Chilocco, and that OSU-UML would lease the purchased equipment from Triton, for seven years at $25,000 per month, when Triton was not otherwise using the equipment." *Id.* ¶ 20(E). Mr. Keogh also provided other documents to USDA showing Triton would use the loan to acquire machinery and equipment worth $4 million, and stating collateral for the loan would be a first lien on all machinery and equipment purchased with loan proceeds. *Id.* ¶ 20(F), (H). Finally, Mr. Keogh verified in loan closing documents executed in December 2010, that the loan proceeds would be used to purchase equipment for Triton's use, that Triton "had marketable title to the collateral subject only to the bank's security interest . . . and that such collateral is sufficient to secure the loan." *Id.* ¶ 20(I).

Based on the information provided by Defendants, the Bank approved and funded a $3.2 million loan to Triton, 80% of which was guaranteed by the Rural Development Administration. Beginning in January 2011, Mrs. Keogh sent a series of draw requests to the Bank to obtain the loan funds; each request was supported by an invoice from EMB Energy to Triton for a battery system (listing component items) with a contract value of $4,158,461.93 to be shipped to Triton via Williams International. The invoices referenced monthly expenses in varying amounts, and the Bank advanced 80% of the amount shown on each invoice until the remaining balance of loan proceeds was exhausted. Each time the Bank paid Triton, Defendants routed funds to EMB Energy, Lawrence Livermore

National Laboratory, or other vendors working on the battery development project, except part of the first advance was used to refund money to an investor in EMB Energy.

During 2011 and 2012, Mrs. Keogh provided the Bank with quarterly balance sheets for Triton. The initial statements showed a battery as a fixed asset valued at $1,392,578.29, but after the Bank inquired about the discrepancy, Mrs. Keogh proposed to Mr. Keogh that Defendants increase the asset value to $4 million by including all battery-related expenses, such as wages, benefits, rent, and travel. The balance sheets then listed a battery as a fixed asset valued at $4,172,979.64. Similarly, when USDA requested in 2012 a list of assets purchased with loan funds, the Bank contacted Triton, and Defendants provided financial statements of Triton for 2011 that showed a fixed asset valued at $4,172,980 described as a "Battery (in progress)" that "is being tested for safety and performance at Livermore National Laboratory in California" and "will be installed at the Chilocco site in Oklahoma" after passing the testing phase. *See* Superseding Indictment ¶ 20(R). When the Bank requested a certificate of insurance to show property insurance on the collateral for the loan, Triton provided a certificate showing the required insurance coverage of $3.2 million for a "PX3 Electro-Mechanical Battery" located at OSU-UML in Edmond, Oklahoma.

Triton defaulted on the loan in December 2012 with a principal balance of more than $3 million owed to the Bank and USDA. Lawrence Livermore National Laboratory terminated the research and development agreement in 2013 based on a lack of funding from EMB Energy. No battery prototype was completed under the agreement, and neither EMB Energy nor Triton ever obtained any ownership interest or title to a working battery.

1.      **Does the Superseding Indictment Adequately Allege Defendants Knowingly Made False Statements?**

Essential elements of the government's charges based on a fraudulent loan to Triton require proof that Defendants made a false statement knowing it was false.  *See* 18 U.S.C. §§ 1001(a)(2), 1014, 1344(2); *see also* Tenth Cir. Crim. Pattern Jury Instrs. 2.46.1, 2.48, 2.58 (3d ed. 2021) (available at https://www.ca10.uscourts.gov/sites/default/files/clerk/ Jury%20Instructions%202021%20Version.pdf).   The focus of Mr. Keogh's Motion, in which Mrs. Keogh joins, is whether the Superseding Indictment sufficiently alleges these elements.

Upon consideration of the government's factual allegations, the Court finds that the falsity of Defendants' statements regarding "equipment" – meaning a functional battery with a market value – and Defendants' knowledge of the falsity are adequately alleged in the government's pleadings.  Defendants' arguments largely ignore the legal standard governing their Motions and instead seek to test the government's evidence.  Defendants seem to contend the allegedly false statements could have concerned a battery that was being built and would be acquired if EMB Energy's project was successful.  However, "an indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true."  *United States v. Redcorn*, 528 F.3d 727, 733 (10th Cir. 2008) (internal quotation omitted).  Accepting as true the government's allegations in support of the charges of bank fraud conspiracy and false statements, the Superseding Indictment plainly alleges the essential elements of falsity and knowledge of falsity that Defendants contend are lacking.

**2.      Does a USDA Rule or Regulation Affect These Elements?**

Mr. Keogh's argument regarding the sufficiency of the loan fraud charges stated in the Superseding Indictment focuses on a USDA rule (now a formal regulation promulgated in 2016) that prohibits loan guarantees for research and development projects.  *See* Mr. Keogh's Mot. Dismiss [Doc. No. 233] at 5-8.  The substance of this rule is included in the government's allegations regarding eligible uses of funds under the Rural Development Administration's loan guarantee program.  *See* Superseding Indictment ¶ 13.  Mr. Keogh contends the rule was unknown to him and could not have informed any false statement or provided knowledge of falsity.  The Court finds, however, that the USDA rule has no bearing on these essential elements.[5]    Accepting the government's allegations, Defendants' false statements spoke about equipment located in specific venues and subject to ownership, title, security interests, valuation, and insurance.  Defendants' awareness of the USDA rule does not affect the sufficiency of the Superseding Indictment to state an offense requiring proof that Defendants knowingly made a false statement.

**3.      Does Count 5 Include a Concealment Charge or Lack Specificity?**

Mr. Keogh seeks a dismissal of Count 5 based on arguments that the Superseding Indictment either improperly includes a concealment charge under 18 U.S.C. § 1001(a)(1) or, if viewed solely as a false statement charge under § 1001(a)(2), lacks specificity.  He argues that the allegations in Count 5 and its incorporation of other parts of the Superseding

---

[5]  Proof that Defendants were attempting to evade a USDA rule may be relevant to show an intent to defraud, and the existence of the rule may show the materiality of the false statements. But Defendants do not challenge the sufficiency of the Superseding Indictment on these grounds.

Indictment suggest that the government intends to rely on his alleged failure to disclose to the Rural Development Administration a plan to use loan funds for EMB Energy's research and development project.

Upon consideration, the Court finds that Count 5 plainly charges a false statement offense under § 1001(a)(2).  *See* Superseding Indictment ¶ 28.[6]  There is no concealment charge to be dismissed.  Nor does the Superseding Indictment lack specificity.  It specifically identifies the false statement that Mr. Keogh allegedly made and sets forth all elements of the offense.  *See United States v. Powell*, 767 F.3d 1026, 1030-31 (10th Cir. 2014).  The additional facts regarding Mr. Keogh's undisclosed plan do not undermine the false statement charge but, instead, tend to show the statement was willfully made and it was material to the Rural Development Administration's decision to guarantee the loan.

For these reasons, the Court finds that Counts 1-10 should not be dismissed based on the insufficiency of the Indictment or the Superseding Indictment.

---

[6]  Paragraph 28 states:

On or about December 29, 2010, in the Western District of Oklahoma and elsewhere,
---------------------------- DANIEL WEBSTER KEOGH,
a/k/a Web Keogh, ---------------------------------------
knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of USDA, an agency of the executive branch of the United States government. Specifically, in loan closing documents for a $3.2 million loan guaranteed by USDA's Rural Development Administration, WEB KEOGH falsely represented that the loan's purpose was to purchase machinery and equipment. He instead intended to and did use the loan proceeds to fund EMB Energy's research and hopeful development of a utility-scale electromechanical battery, pursuant to a CRADA that WEB KEOGH did not disclose to USDA.

All in violation of Title 18, United States Code, Section 1001(a)(2).

B.      **Wire Fraud**

To provide context for the parties' arguments regarding the wire fraud conspiracy and offenses, a summary is needed of the factual allegations regarding OSU-UML, its programs and services, and Defendants' relationships with it.

OSU-UML is a nonprofit research center owned by Oklahoma State University that was founded to provide research, development, testing, and evaluation to DoD and other entities.  *See* Superseding Indictment, ¶ 7.   At all relevant times, OSU-UML was a contractor-operated facility, and the contractor was Triton.   As operator of OSU-UML, Triton provided all staffing and all services needed to manage, operate, and provide reporting for OSU-UML's programs.   Mr. Keogh also served as the laboratory director of OSU-UML until November 2012; Mrs. Keogh served as its director of finance until October 2011.

OSU-UML executed a series of contracts with DoD to support the United States military, including use of Jungle Advance Under Dense-vegetation Imaging Technology ("JAUDIT") for surveillance activities.   As the prime contractor, OSU-UML's role was limited to managing the necessary subcontractors and making billing submissions to DoD. CAT was the subcontractor that performed JAUDIT work.   Like other subcontractors, CAT billed OSU-UML for its work approximately once a month, and each month, OSU-UML submitted an invoice to the federal government for all contract expenses, including OSU-UML's management costs and all subcontractor costs.   After receiving payment of an invoice from the government, OSU-UML paid CAT and any other subcontractor.   "Given CAT's primary role in providing the JAUDIT services, OSU-UML generally owed to CAT

12

approximately 85-90% of the total payment that OSU-UML received from the federal government for a billing period." *Id.* ¶ 40.

According to the government's allegations, however, CAT's invoices went unpaid or partially unpaid by OSU-UML during Mr. Keogh's tenure until CAT had amassed an outstanding balance of approximately $3 million in overdue JAUDIT invoices for which the federal government had paid OSU-UML. *Id.* ¶ 42. The unpaid funds allegedly were used by Defendants for other ventures, including Mr. Keogh's investment in EMB Energy, Mrs. Keogh's investment in Liberté, and a funding scam perpetrated by two unnamed individuals who allegedly promised Mr. Keogh they could provide multimillion-dollar donations to OSU-UML if it first transferred money to their accounts. Because the subcontracts between OSU-UML and CAT contained timing obligations (requiring payment to CAT within certain time periods), Defendants allegedly made false lulling statements and caused OSU-UML to make partial payments to CAT in order to ease its concerns about nonpayment of past-due invoices for its JAUDIT services.

Defendants' false statements and the lulling payments are alleged to be acts in furtherance of a wire fraud conspiracy the object of which was "to divert federal funds intended to pay CAT for wartime defense services and instead to spend those funds on expenses and projects not related to CAT." *Id.* ¶ 55. The substantive wire fraud offenses in the Superseding Indictment allege: Count 13, Mr. Keogh sent an email to CAT in January 2012 falsely stating that OSU-UML had not received a government payment for JAUDIT services, shortly after he had directed OSU-UML to use the payment it had received primarily for non-CAT expenses; Counts 14 and 15, Defendants caused wire

transfers to be made from Triton's Oklahoma bank account to a Florida bank account of Erys, the company through which Mrs. Keogh provided accounting and administrative services to OSU-UML and paid Liberté's expenses;[7] Counts 16, 17 and 18, Mr. Keogh caused wire transfers to be made from Triton's bank account to a Texas account of EMB Energy and from OSU-UML's bank account to New York and Ohio accounts of an individual involved in the donation scam;[8] and Count 19, Mr. Keogh sent a draft of a lulling letter to the individual to be signed and returned so Mr. Keogh could use the letter to assure subcontractors, including CAT, of available funds.[9]  Counts 20, 21 and 22 allege that Mr. Keogh embezzled from, or converted money of, OSU-UML by making the wire transfers in Counts 17 and 18 to the individual in the donation scam and by making a third wire transfer from OSU-UML to Triton that Triton then transferred to EMB Energy to pay its debts.[10]  With these factual allegations and charges in mind, the Court turns to consider the issues raised by Defendants' Motions regarding the alleged wire fraud conspiracy and fraudulent wire transfers.

---

[7] *See id*. ¶¶ 6, 10.  These transfers allegedly occurred the day after Mr. Keogh caused OSU-UML to transfer a similar amount to Triton (while owing CAT more than $1 million in overdue JAUDIT payments) and one day before Mrs. Keogh paid a similar amount to satisfy Erys's debt for Liberté purchases.  *Id*. ¶ 57(E).

[8] *See id*. ¶¶ 56(G), 57(F), 57(K), 63.

[9] *See id*. ¶¶ 52, 57(N), 64.

[10] *See id*. ¶¶ 57(L)-(M), 67.

**1.      Does the Superseding Indictment Adequately Allege Fraud?**

Defendants primarily assert that the government's wire fraud case is legally flawed because it is based on a contractual dispute and mere delay in OSU-UML's payments to CAT rather than a fraudulent use or theft of government funds.  Defendants complain that the government is attempting to twist a problem of poor accounting or mismanagement into a scheme to defraud CAT, as charged in Counts 12 through 19 of the Superseding Indictment.

The Court rejects Defendants' view of the government's pleading.  The Superseding Indictment contains specific allegations of fraud and fraudulent intent by Defendants in a scheme to divert federal funds received by OSU-UML for CAT's JAUDIT work to Defendants' business obligations or personal projects.  Defendants' arguments simply ignore the factual allegations of the Superseding Indictment, summarized *supra*, and the Court finds them unpersuasive.  Count 12 adequately states the offense of conspiracy to commit wire fraud and Counts 13 through 19 adequately state wire fraud offenses.

**2.      Did the Wire Transfers to Erys Further a Fraudulent Scheme?**

Mrs. Keogh also challenges the substantive wire fraud charges against her because they are based on wire transfers from Triton to Erys that allegedly could not have been part of the fraudulent scheme, which was complete when money was transferred from OSU-UML to Triton.  This argument is based, in part, on Mrs. Keogh's view that the alleged scheme was designed to defraud OSU-UML and obtain funds from OSU-UML to which Triton was not entitled.  *See*, *e.g.*, Mrs. Keogh's Mot. Dismiss Counts 12 & 14-16 [Doc. No. 102] at 8 ("the government alleges OSU-UML was the victim of the alleged fraud

scheme"). This premise is incorrect. The object of the wire fraud conspiracy and the fraudulent scheme was to defraud CAT by using federal funds it had earned and was entitled to receive for Defendants' own purposes. The wire transfers to Erys allegedly accomplished that scheme by funding Mrs. Keogh's interest in Liberté.

Mrs. Keogh also relies on *United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008), to argue that once funds are transferred to an account controlled by an alleged perpetrator of a fraudulent scheme, the funds are outside the victim's control and the scheme has come to fruition; subsequent transfers are not an essential part of the scheme but are merely the perpetrator's enjoyment of the fruit. As applied to this case, OSU-UML's transfers of funds to Triton allegedly put the money within Defendants' control and subsequent transfers to Erys were not necessary to accomplish the alleged scheme. According to Mrs. Keogh, "once the funds were deposited into Triton's account, the Defendants could have chosen to spend them however they wished." *See* Reply Br. [Doc. No. 115] at 4.

The Court finds that *Redcorn* is distinguishable. First, the part of the opinion on which Mrs. Keogh relies addressed the sufficiency of the trial evidence to support the defendants' convictions; the court of appeals found that the indictment was sufficient to state a wire fraud offense. *See Redcorn*, 528 F.3d at 737. Further, in *Redcorn*, the defendants were charged with embezzlement from a health care benefit program, wire fraud, and money laundering. The embezzlement scheme involved diverting incoming insurance premiums received by a company they controlled by moving the funds from the company's account to their personal accounts at the same bank and then wiring the money to their brokerage accounts in another state. The court of appeals found that the scheme

16

was complete when the defendants deposited the embezzled funds into their own accounts. The Tenth Circuit rejected the government's theory that running the funds through the defendants' personal bank accounts to their brokerage accounts furthered the embezzlement scheme because the court "found no evidence that, as the scheme was conceived by the perpetrators at the time, the charged wire transfers from [their] personal [bank] accounts to their personal [brokerage] accounts were necessary to gain control over the funds or to conceal the nature of [the perpetrator's] fraud on [the insurance company]." *Id*. at 741-42 (internal quotation omitted).  In contrast, the government alleges in this case that Defendants used the charged wire transfers from Triton's account to Erys's account to gain control over the funds so Mrs. Keogh could use them for Liberté.

In short, the Court finds that Counts 14 and 15 adequately state wire fraud offenses by Mrs. Keogh.

### 3.    Is Count 12 Duplicitous?

Mrs. Keogh asserts that the wire fraud conspiracy in Count 12 is duplicitous because it encompasses two separate conspiracies, one between Defendants to transfer funds from OSU-UML to Triton and a second between Mr. Keogh and two other individuals to transfer funds from OSU-UML to accounts they controlled.  *See* Mrs. Keogh's Mot. Dismiss at 16. This argument was initially supported, in part, by references in the Indictment to the individuals as "coconspirators."  *See* Indictment, ¶¶ 44-53, 57(K), (N)-(O), 63-64.  One of the changes made by the Superseding Indictment is to refer to them now simply as "individuals."  *See* Superseding Indictment, ¶¶ 44-53, 57(K), (N)-(O), 63-64, 67. However, Mrs. Keogh's point is that the government describes in its pleadings two schemes

that, in her view, "lack a unified or shared objective" and thus cannot be charged in a single count.  *See* Mrs. Keogh's Mot. Dismiss at 18.

The Court is not persuaded by this argument, which overlooks the object of the conspiracy charged in Count 12.  Recall that the conspiracy was designed to divert federal funds owed to CAT for its JAUDIT work to Defendants' own purposes.  Defendants allegedly executed the scheme in several ways, which included causing OSU-UML to transfer money it received under the DoD contracts to accounts that Defendants controlled or that Defendants believed would further the scheme – namely, accounts of an individual who promised to return a greater amount as "donations" to OSU-UML.  *See* Superseding Indictment, ¶ 57(K).  As framed by the government, Defendants intended to use the investment scheme with the individuals as part of a unified plan to continue diverting money owed to CAT and lulling CAT about the status of federal funds.  *See* Govt's Resp. Br. [Doc. No. 112] at 13.  The Court finds that Mrs. Keogh's argument goes to the sufficiency of the government's proof, not the sufficiency of its pleading.

## C.    Theft from an Organization Receiving Federal Funds

In addition to arguing that the government fails to allege fraudulent or criminal intent to convert federal funds, Mr. Keogh asserts in his challenge to Counts 20 through 22 of the Superseding Indictment that the government's allegations do not show OSU-UML was an organization covered by the theft statute, which requires that the organization receive benefits "under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  *See* 18 U.S.C. § 666(b). Mr. Keogh ignores a paragraph of the government's pleading that alleges this qualification

is met and, instead, focuses on factual allegations showing OSU-UML was a commercial government contractor, which allegedly does not satisfy the statute. *See* Mr. Keogh's Omnibus Mot. at 11-13.

The Court rejects this contention. The Superseding Indictment states: "OSU-UML was an organization that received more than $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance" in a one-year period. *See* Superseding Indictment ¶ 66. Instead of opposing Mr. Keogh's interpretation of § 666(b), the government responds to his Motion by stating that OSU-UML received funds in excess of the statutory amount under federal grant and assistance programs, apart from the DoD contracts. *See* Govt's Resp. Omnibus Mot. at 7. Further, the government's proof of its allegations "is a matter of the evidence, not the indictment." *Redcorn*, 528 F.3d at 734; *see Powell*, 767 F.3d at 1031 (whether forged checks were of a federally insured bank was a question of evidence and not pleading). The prosecutors have no obligation "to lay their evidentiary cards on the table before trial." *Pope*, 613 F.3d at 1259-60. Here, the allegations of the Superseding Indictment, if true, establish that OSU-UML was a covered organization.

Finally, Mr. Keogh seeks dismissal of the theft counts on the ground that CAT, not OSU-UML, was the victim allegedly injured by a conversion of federal funds and CAT was not a qualifying organization. This argument is made without regard to the allegations of the government's pleadings. Counts 20 through 22 are not based on the deprivation of funds that CAT suffered when its invoices went unpaid or partially paid. The theft charges are based on occasions in September 2012 when Mr. Keogh, acting as OSU-UML's

laboratory director, directed two payments of OSU-UML's funds to accounts of an individual who had no right to receive any money and one payment to Triton that was made to funnel money to EMB Energy. The government's allegations thus show three violations of § 666(a) that occurred when Mr. Keogh intentionally misapplied or converted OSU-UML's funds to the use of a person who was not the rightful owner.

In short, the Court finds the government's allegations are sufficient to give notice to Mr. Keogh of his violations of § 666, and thus, Counts 20 through 22 of the Superseding Indictment should not be dismissed.

## Conclusion

For these reasons, the Court finds that Defendants have failed to show a proper basis to dismiss any charge of the Superseding Indictment for failure to state an offense.

**IT IS THEREFORE ORDERED** that Defendant Daniel Webster Keogh's Omnibus Motion to Dismiss the Indictment [Doc. No. 97], Defendant Danielle Keogh's Motion to Join the Omnibus Motion [Doc. No. 100], Defendant Danielle Keogh's Motion to Dismiss Count 12 and Counts 14 Through 16 Based on Insufficiency of the Indictment and Duplicity [Doc. No. 102], Defendant Daniel Webster Keogh's Motion to Dismiss the Superseding Indictment [Doc. No. 233], and Defendant Danielle Keogh's Motion to Dismiss the Superseding Indictment and Join Daniel Webster Keogh's Motion [Doc. No. 235] are **DENIED**.

**IT IS SO ORDERED** this 7th day of May, 2021.

TIMOTHY D. DeGIUSTI
Chief United States District Judge